**Pietrusewicz v. Pietrusewicz**

458

C.P. of Berks County, No. 05-2213 #5

*Robert T. Ullman*, for plaintiff.
*Eric L.B. Strahn*, for defendant.

LASH, *J.*, Aug. 14, 2014—The matter before this court is the petition of defendant, Paul Pietrusewicz (hereinafter "father"), to Modify a Child Custody Order entered by this court on November 21, 2012. Trial was held on July 21 and 22, 2014. This court enters the following Findings of Fact:

## I. FINDINGS OF FACT

1. Plaintiff, Teresa Pietrusewicz (hereinafter "mother"), is an adult individual who currently resides at 27 Ridge Drive, Fleetwood, Berks County, Pennsylvania.

2. Defendant, Paul Pietrusewicz (hereinafter "father"), is an adult individual who currently resides at 2359 West Hedding Street, San Jose, California 95128.

3. The parties are the natural parents of four (4) children, two (2) of which are minors. The minor children are a son, M.J.P., born June 25, 1997, and a daughter, M.P., born January 23, 2001, (hereinafter "Minor Children"). The parties other children are a daughter, Kaitlyn Pietrusewicz, born July 16, 1991, and a son, Austin Pietrusewicz, born September 18, 1993.

4. The parties are husband and wife, having been married on October 10, 1987. The parties separated sometime in October — December 2012 and have remained living separate and apart. A divorce action is pending in Berks

County court.[1]

5. Shortly after the separation, father moved to the State of California. Moving with him was the eldest son, Austin. The other three (3) children remained with mother in the marital residence.

6. Upon separation, mother filed the initial custody complaint, which resulted in an agreement, entered as a court order on November 21, 2012, setting forth, among other things, that the parties would share legal custody, that mother would have primary physical custody during the school year, with father having partial physical custody, and that father would have primary physical custody during the summer months, with mother having partial physical custody.

7. In June 2013, father filed the within petition to modify custody, seeking primary custody of both minor children.

8. Pursuant to father's petition to modify, this court scheduled a trial for July 31, 2013. Some testimony was taken, but then the parties agreed to forgo completion of the trial, reaching an agreement. The agreement set forth, among other things, that father would assume primary custody of the parties' minor son, with mother to have partial custody for two (2) consecutive weeks in the summer months and for some time during the Thanksgiving holiday, provided that father would

---

1. Mother filed a divorce on February 16, 2005 but withdrew the divorce action on March 10, 2005. The current action, docket no. 05-2213 No. 5, was filed on July 21, 2010.

be spending Thanksgiving in the Commonwealth of Pennsylvania. This portion of the order was entered as a final order finally resolving custody of the minor son. The order also provided temporary relief regarding the minor daughter, setting forth that mother would retain primary physical custody, with father to have partial custody at such times as agreed by the parties, also providing that all of father's contact with the minor daughter would be monitored and recorded by mother, including any face-to-face contact through Skype. The minor daughter was also to participate in reunification counseling to facilitate a reconciliation between her and mother. The matter now before this court concerns the custodial status of the minor daughter.

9. Father resides in the San Jose Unified School District. The minor son attends Abraham Lincoln High School in that district. If the minor daughter would reside with father, she would attend the Herbert Hoover Middle School. Both the Abraham Lincoln High School and the Herbert Hoover Middle School are in close proximity to father's home. Mother resides in the Brandywine Heights Area School District, where the minor daughter is currently attending.

10. On or about October 29, 2012, mother filed protection from abuse petitions against father and the elder son, Austin. On or about November 14, 2012, the petitions were withdrawn by mother, without prejudice.

11. Father is employed as owner/president and sole employee of Market2Go, LLC, a business he founded in 2002. The firm handles telecommunications consultations.

Father states his work schedule is flexible due to his autonomy and to enable him to be available for his family. Father conducts most of his business over the internet or by telephone and can operate his business from virtually anywhere.

12. Mother is employed as a school nurse in the Brandywine Heights Area School District.

13. The parties' respective homes are both suited environmentally for rearing minor children.

14. An independent psychological evaluation was compiled by Arlene B. Ginsburg, Ph.D. She conducted interviews with the parties, and all four (4) children, administered the Minnesota ultiphasic Personality Inventory-2 (MMPI-2) to the parties, administered the Perception of Relationships Test (PORT), partial, Bricklin Perceptual Scales (BPS), partial, to the minor daughter, and Rotter Incomplete Sentence Blank (RISB), high school figure drawings, to the minor son. Dr. Ginsburg prepared a written report dated July 23, 2013, and testified at the trial of July 31, 2013. Dr. Ginsburg then compiled an updated evaluation, dated April 30, 2014, to be submitted for purposes of the within trial, however, neither party called her to testify, nor moved for admission of her updated report into evidence.

15. The elder daughter, Kaitlyn, is estranged from father.

## II. DISCUSSION

In making disposition, this court considered the

testimony of the parties, reunification counselors, Vanessa Hagen and Amy Alverez, mother's friend, Christina Becker, and her 13 year old daughter, Samantha, the elder son, Austin, the *in camera* testimony of the minor children, and testimony taken at the first trial dated July 31, 2013, which included a representative from Children & Youth Services, Lauren Heydt, a neighbor, Diane C. Yoder, and the psychologist, Arlene B. Ginsburg, Ph.D. This court also considered the exhibits of the parties, including Dr. Ginsburg's report dated July 13, 2013.[2]

While various issues and complaints were raised by the parties, there were a few predominate themes which spoke to the heart of the controversies and which gave this court substantial oncern. Father's presentation focused on the minor daughter's strong desire to relocate to California to reside with him. This closely resembled the same desire expressed by the minor son back in July of 2013, which, upon recommendation of the psychologist, and with the agreement of the parties, resulted in the minor son moving to California. Father's presentation also focused on several significant complaints against mother, including spying on the minor children, as well as on father while he resided in the home, calling the police to attempt to control the minor children's behavior, videotaping the minor children's actions while following them around the house, searching their belongings when they came and left the house, having their lockers searched at school, refusing the minor children access to the elder son, Austin,

---

2. For reasons already set forth, this court did not consider the updated evaluation of Dr. Ginsburg dated April 30, 2014.

even when he came to the house to visit, locking the minor children out of the house, even during cold weather when they had no coats, and otherwise engaging in actions which demonstrated her mistrust and/or paranoia against father and the minor children.

Mother's primary contention is that father has orchestrated a campaign of alienating the minor children's affections against her. She is very aware that the minor daughter, as well as the minor son and Austin, want to reside in California, believing that this has occurred because father has convinced them that she is a bad other. Mother is certain that if the minor daughter moves to California, she will never be able to rekindle any form of relationship with her.

Father urges that he is well capable of caring for the minor daughter and has established this through his parenting over the years. He considers his parenting style one of mentoring and uiding, in contrast to mother who is controlling and authoritarian. He is proactive in the minor children's lives in all aspects. He assists them with their education. He believes that the minor daughter would thrive at the middle school in California, as it is a magnet school, which features, among other things, drama classes, which is an area of great interest to her. He enjoys recreation with the children, including skiing, bicycling, and mountain biking. He is only 32 miles from the ocean. He likes to take extended travel vacations with the children. He supports the minor daughter's extracurricular activities, including soccer and girl scouts.

Father claims that during the last stages of the parties' cohabitation, he was required to do all the shopping for himself and the children, did the cooking and otherwise provided the daily maintenance. According to him, mother essentially abdicated her responsibilities.

According to father, the minor daughter is adamant that she wants to reside with him, not with mother. He believes that she is estranged from mother, afraid of her, and wants to move immediately.

Father notes that the minor daughter loves spending time in California. She gets along very well with her two (2) brothers, in contrast to her estranged relationship with her elder sister.

Father complains that mother has engaged in paranoic, abnormal behavior, which has burdened the minor daughter with severe stress. While father still resided in the home, mother began surreptitiously videotaping the family. Father believes that this was done to enable mother to "set him up," to get him out of the house through a protection from abuse order. Ultimately, she did file a petition for protection from abuse against both he and the elder son, Austin. After father left, the surreptitious videotaping continued. Mother would also follow the minor children around, even following the minor son when he would leave the house on his bicycle.

On one occasion, after the minor son had already begun residing with father, he was scheduled to return to visit with mother. He anticipated coming to the marital

home, relaxing in his former bedroom and spending time with his friends. However, mother never allowed him anywhere near the home, instead travelling to a beach area in Delaware for what she called a "vacation." The minor son and the minor daughter, who was also there, opposed this, to the extent that the minor son became petulant and was ordered out of the house by the owner of the house with whom the family was staying, resulting in the minor son spending time alone on a highway in the State of Delaware, with no means to care for himself. Ultimately, mother and her friend, the homeowner, allowed him to come back to the house.

Father accused mother of refusing to turn over personal items belonging to him. Mother denied, even in court, that she had those items. According to father and the neighbor, Diane Yoder, these items were discovered by the minor children and some of the items were taken to Ms. Yoder's house. Father acknowledges that he instructed the minor children to take the items to Ms. Yoder's house. Mother contended that the minor children were stealing from her so she began searching backpacks, even on one occasion having the minor son's school search his locker. Mother also resorted to calling the police against the minor children for allegedly stealing things and also for such things as turning the house lights on and off. There was an incident at a bowling alley where mother confiscated the minor son's backpack and gave it to a friend who took off with it.

Father claims that mother lies about him and about the

minor children, and also lies in front of the minor children, totally undermining her authority and credibility with them. The minor son says her actions are "fake." On the incident where the minor son took items to Ms. Yoder's house, both the minor son and Ms. Yoder claim they saw father's wallet. Mother denied having the wallet, and denied that the wallet was present at Ms. Yoder's house. Another time, Austin came to the house to see his brother and sister. Mother refused to allow Austin to see the minor children, then told the minor children, when they asked who was at the door, that it was a florist.

Mother's paranoic actions included restricting the minor children from access to the house. On one occasion when the minor son wanted to use the bathroom, he found that he was locked from the house. Another time, during cold weather, the minor children were locked from the house without coats. Eventually, mother opened the door and threw winter coats out for them but would not allow them in the house. She would sometimes barricade the doors with furniture, and sometimes would sleep on a recliner in a spot in the kitchen providing sight lines to all areas of the house.

Father states he was thwarted from telephone contact with the minor children, as mother would confiscate the cell phone, and would refuse to allow internet access, either at home or at a neighbor's house.

Father avers that mother engaged in abusive behavior. He believes that she slapped the minor daughter on at least four (4) occasions. On one occasion, he took a photograph

of the minor daughter's face, showing a red mark. That slap occurred because the minor daughter could not find toilet paper in any of the bathrooms that she was allowed to use, so she attempted to go to mother's bathroom for toilet paper and was punished. Mother has also threatened the minor children, including threatening them with calling the police, and has periodically cursed at them. On one occasion, she exclaimed to her minor son that she anticipated that one day he could do something like "put an ax in her back." This comment was very stressful to the minor children.

Mother acknowledges that her relationship with the minor daughter is strained, but blames this on father's orchestrated alienation of the minor children from her. She notes that in prior years, she and the minor children, especially the minor daughter, had a wonderful relationship. She was very active in their education and recreation. They roller and ice skated together, went bowling, did pottery, and watched television series together.

Mother alleges that father began spying on her, accessing her computer to gain information, particularly on finances. Ultimately, he restricted her from receiving any of the marital income, which is why she stopped shopping for groceries. After father left the house, he instructed the minor children to spy on her, and to take personal property from the house. Her response was to lock access to the house, search backpacks, and involve the police. She denied having personal items belonging to father, claiming that this was another allegation used to

turn the minor children against her. Mother also states that father would prohibit the minor children from contacting her by phone during his periods of custody.

In support, she points to the fact that when father separated and moved to California, he allowed both of the minor children to continue to reside with mother. If she was as bad as he claims, why would he do this. Additional evidence comes from the reunification counselling. There have been two (2) counsellors involved since September of 2013, both of whom noted that the minor daughter's relationship with mother was at first difficult, if not nonexistent, but after several sessions, the minor daughter would warm up and mother and daughter would begin demonstrating a "normal mother-daughter relationship." Unfortunately, when the minor daughter spent some time with father, she would regress, and the counsellors would have to start all over.

Mother argues that father should not be rewarded for turning the minor children against her, for using the minor children to spy on her, and to steal things from her. She loves the minor children and wants an excellent relationship with them. She is fearful that if the minor daughter moves to California, the relationship will be forever lost. The reunification counseling, which has been successful, would also be compromised, due to the geographic limitations.

Dr. Ginsburg's report and testimony were quite extensive, and in large part provided a reiteration of the same issues and conflicts raised by the parties at trial.

Her test results set forth that both parties were considered within normal limits. Dr. Ginsburg does note, however, that both parties in the MMPI-2 profile showed a tendency to feel victimized and to distrust others.

On pages 3 and 4 of her report of July 23, 2013, Dr. Ginsburg provides a synopsis of the dynamics of the parties:

Both parents are estimated to be of above average intelligence. They both clearly love their children, are concerned about their well-being, and have helped them with their school work. [Father] and [mother] have consistently involved all four of their children inappropriately in their many years of marital conflict. Both have shown extreme paranoia about the other parent. Both have hidden their important possessions in their locked vehicles to prevent the other parent from stealing them. Both parents have gained access to the other parent's car without permission in order to retrieve allegedly stolen items. The children have been exposed to innumerable police incidents. In addition to police reports about father mother has called in complaints about both of her sons. Each parent alleges being physically harmed or controlled by the other in the past but the history primarily suggests mutual involvement due to intense marital conflict rather than either parent having a personality pattern predisposed to physical abuse. Both parents acknowledged occasional use of physical discipline with their four children, but not to an extent that would constitute physical

abuse. (Father acknowledged hitting, using duct tape, grabbing Kaitlyn's cell phone. Mother acknowledged slapping [minor daughter] once, pushing [minor son], and damaging Austin's bedroom door.) Both parents have downgraded the other parent to the children (mother in the past telling the younger children it was not right to be giving their father back rubs and father telling the children that what mother was doing when she videotaped him was "the kind of thing that gets you put in a mental asylum"). This examiner did not find evidence that mother or father suffer from a major mental illness independent of their reaction to high marital and custody conflict. Mother currently appears to be the parent more encouraging of the children's relationship with the other parent.

Father reported a clear increase in his quality of life in California — the cost savings of living in a home he already owns, the proximity to business and leisure opportunities, and greater comfort with the people he meets. Delaying reunification therapy and putting aside the problems the children have reported in their relationship with their mother as father suggested would be likely to result in more entrenched alienation from mother less amenable to professional intervention. If [minor son] and [minor daughter's] positive relationships with mother are not restored with the help of reunification therapy their self-esteem and ability to form future healthy and lasting close interpersonal relationships are likely to suffer significantly.

It is this examiner's professional opinion that [minor son] and [minor daughter's] alienation from mother results from the inappropriate behavior of both parents who have perhaps inadvertently responded in ineffective or damaging ways to the children's rebellion, fear, and anger. Mother has called the police too often (for example inappropriately seeking the help of the police in early 2010 to get Austin to return her personal journal to her), has tried to force her way into Austin's or [minor son's] room when they were too angry to respond reasonably rather than back away to defuse the situation, and made one statement to [minor son] (suggesting that if he continues to be so out of control what would stop him from going further and doing something like putting an ax to her back) that it seemed to justify [minor son's] reported fear of her. (Father has also called the police about his wife's behavior on multiple occasions but not nearly as often and not for help controlling his sons.) During evaluation interviews father more extensively put mother in a bad light than mother put him in a bad light when interviewed with the children. Father has discussed his interpretations of mother's words and behavior with the children, influencing them to share his opinions. "[Minor son] feels, as I do, that [mom's comment about the ax] was so far reaching [that]...she may be justifying in her head striking out at [minor son] [physically]."

As of July 2013, Dr. Ginsburg recommended that the minor son relocate to California to live with his father. She noted that the minor son benefited from continuous

contact with his father and older brother, and also noted that the minor son saw "his mother in an exaggerated negative manner because of mother's and father's inappropriate behavior."[3] Regarding the minor daughter, Dr. Ginsburg recommended that she continue to reside in Pennsylvania with her mother, at least until December 2013. She notes that the minor daughter had had a close relationship to her mother which deteriorated sometime in January 2013,[4] although she notes that the negative feelings against mother began intensifying in 2010 after mother had filed for divorce and then again in 2012 when mother falsely accused father and Austin of improper behavior causing him to be removed from the house through a PFA.[5] Nevertheless, Dr. Ginsburg saw no safety concerns with mother and believed that the developing estrangement between mother and the minor daughter could be remedied through reunification therapy. If the minor daughter would immediately move to California, the therapy would be compromised, and the estrangements between mother and daughter would likely be cemented. Dr. Ginsburg's recommendation was in part the basis for the parties reaching the agreement on July 31, 2013, which provided that the minor son would be permitted to move to California with his father, that minor daughter would remain with mother, and that reunification therapy would commence.

At issue is primary physical custody. The paramount

---

3. July 23, 2013, Report at p. 4.
4. July 23, 2013, Report at p. 4.
5. July 23, 2013, Report at p. 10.

concern in a child custody proceeding is the best interests of the child. *Costello v. Costello*, 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton*, 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

Under Pennsylvania's custody statute,[6] the general assembly listed several factors the court must consider, when relevant, in awarding custody of a child, giving weighed consideration to those factors which affect the safety of the minor child.

The first factor addresses "which party is more likely to encourage and permit frequent and continuing contact between the child and another party." Neither party appears capable of supporting the other for reasons already set forth. There is, of course, the geographic limitations which greatly restrict personal access by the non-custodial parent. Additionally, the parent having custody has thwarted the non-custodial parent from having phone or internet access to the child. This factor does not favor either party.

The next factor considers the "present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate

---

6. 23 Pa.C.S.A. §5321, et seq.

physical safeguards and supervision of the child." Each party claims abusive contact against the other in the past. Father contends that mother has been physically abusive to the minor daughter, with the slapping incidents, and causes emotional and psychological damage through her clear mistrust of the child, as well as her lies, cursing and engaging in other inappropriate conduct. This court finds that father is correct that mother's behavior has been detrimental to the child's welfare. Assuming for the sake of argument that mother had to protect herself and her relationship with the minor children from father's actions, she nevertheless overreacted. Under no circumstances should she be locking minor children from the house, particularly in cold weather, blockading doors, calling the police for non-criminal matters, directing the school to search a locker or a friend to search a backpack, or surreptitiously videotaping the family. Considering these events, and the fact that mother has been caught in lies by the minor children and by this court, as will be discussed further, it is a wonder that she would have any credibility with the child whatsoever. The reunification counsellors' well placed efforts notwithstanding, the child has been detrimentally affected. This factor favors Father.

The next factor concerns "the parental duties performed by each party on behalf of the child." According to both parties, father performed the majority of the maintenance for the child during the later stages of the parties' residence together, although each blames the other for mother's abdication.

One of the few positives in this case is Father's commitment to providing for his minor children. He does provide good oversight and supervision, and is genuinely interested in their daily activities. Were it not for the alienating attacks against mother, his parenting record would be acceptable.

Mother appears to have the capacity to properly perform all parenting duties but has compromised this capacity by engaging in aberrant behavior. Further, she has been less involved overall than father. This factor favors father.

The next factor concerns "the need for stability and continuity in the child's education, family life and community life." As mother resides in the marital home, and in the school district where the child has matriculated, there is a measure of continuity in mother's favor. While moving to California would represent a reuniting of her with her two (2) brothers and her father, she would find herself in a new curriculum and having to meet new friends. That being said, in reviewing the two (2) households, father appears better able to provide a stable home environment. This court anticipates that the child would soon develop into a steady routine at father's home, with father providing appropriate structure and support. This factor favors father slightly.

The next factor concerns "the availability of extended family." Neither party focused on this issue. There was some evidence that mother is estranged from members of her family due to some financial dealings. Certainly, to the extent there is extended family involvement, it would

more likely occur in Pennsylvania. Based on the lack of evidence, this court affords no weight to this factor.

The next factor addresses "the child's sibling relationships." The minor daughter has a very strong relationship with her brothers in California. Her relationship with her older sister is strained. Mother contends that the state of these relationships is due to father's persuasions, even to the point that he enlisted the minor son to assist him in recruiting his sister to "their side." It is apparent to this court, however, the minor daughter has always been very close to the minor son and to Austin. This factor favors father.

The next factor involves "the well-reasoned preference of the child, based on the child's maturity and judgment." The minor daughter is very intelligent and articulate. She was able to answer questions directly and also volunteered additional information. This court finds her to be competent and will give some weight to her comments. This court issues an addendum to this opinion, to be viewed by counsel but to be sealed from view of the parties, setting forth in greater detail this court's analysis of the child's statements made by her during the *in camera* conference.

The next factor addresses "the attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm." There is no doubt that father has engaged in behavior designed to further his objective, that is to obtain primary custody of both minor children. He has disparaged mother in front

of the minor children. He has used the minor children against mother, including employing them to take items from her house, which though rightfully belonging to him, should have been addressed through the attorneys or by the court. He has used the minor children to get information about mother, although in some cases, the minor children may have volunteered this information, as they have completely aligned themselves with him. The minor daughter perceives that mother is responsible for the divorce, partially because it was she who sought the divorce, but also partially due to father's weeping, sad demonstrations before the minor children, while mother was trying to get him to leave the house. Father is cajoling and pandering. Partly due to these actions, and partly due to mother's behavior, the minor daughter now does not want to reside with mother, mistrusts her, and wants to start a new life with father in California. This court also notes that mother has also attempted to alienate the minor children against father, but these actions had no chance for success. This factor favors mother.

The next factor concerns "which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." This factor strongly favors father. He is loving and nurturing. He has a strong relationship with the minor daughter. Mother, conversely, is so preoccupied with her paranoiac behavior that she is without capacity to provide the nurturing required for minor daughter.

Minor daughter has suffered emotionally, with both

parties being responsible. The reunification counselling needs to continue, with father supporting this counselling. If he continues to undermine the counselling, mother will never have any type of relationship with the child, at least until the child reaches a level of cognition that she can analyze all aspects of this complicated relationship. At present, father is better able to provide the love and nurturance.

The next factor concerns "which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child." Father is better able to perform these tasks, for reasons already set forth. This factor favors father.

The next factor addresses "the proximity of the residences of the parties." This factor greatly impacts the schedule, for it eliminates the possibility of frequent contact, and inhibits the ability of reunification counselling. Father chose to move to California and create this issue. This factor favors mother.

The next factor addresses "each party's availability to care for the child or ability to make appropriate child-care arrangements." Father is available, with child care concerns not being necessary. Father works from home with a flexible schedule. Mother works part time and has made arrangements when necessary with neighbors. This factor favors father, but only slightly.

The next factor relates to "the level of conflict between the parties and the willingness and ability of the parties to

cooperate with one another." As is clear, the parties have little, if any, ability to cooperate. Each have at times taken aggressive actions against the other. Each mistrusts the other. Unless the parties find a way to mend fences, at least to the point where they can work in concert on behalf of their children, the children will continue to suffer. This factor does not favor either party.

The last two (2) named factors, relating to "the history of drug or alcohol abuse of a party or member of a party's household" and "the mental and physical condition of a party or member of a party's household," are not factors in the case, based on the report of Dr. Ginsburg and because any other evidence regarding these matters is inconsequential.

One final factor is mother's lack of credibility which has compromised the minor children's ability to trust her. It is apparent that mother, on occasion, did not hesitate to lie directly to the minor children. The minor son is aware that she has lied to all involved, including the court, about her retention of father's wallet, even denying that she had the wallet after Ms. Yoder testified that she saw mother with the wallet in her hand at Ms. Yoder's house. This court ultimately found it necessary to caution her about perjuring herself. After the warning was given, she nevertheless made statements regarding the videotaping which were clearly contradicted by physical evidence produced by father's attorney. Her testimony, as a whole, cannot be considered trustworthy. Further, her dishonesty lends support to father's belief that mother may have been

orchestrating the separation by attempting to "set him up" and get a protection from abuse order against him. If so, father's own wrongful actions may have been responsive, not simply coming from father's own bad intent. This factor strongly favors father.

It appears necessary for the sake of the minor child to transfer custody to father. Father will provide a loving and nurturing household. He will make certain that her educational, medical, and other needs are properly met. The sibling relationship is also a basis for the change, as the minor daughter and the sons, with father, have developed a very close bond, which would be further enhanced by her moving to California. The child's preference is also a factor which this court weighed in favor of granting father primary custody.

One of the stronger factors in support of this decision is mother's improper behaviors, and the resulting loss of credibility with the children. Mother's conduct has exasperated her minor children. While she points to Father pulling them from her, in fact, she has driven them away. If she had chosen to perform properly as a loving, caring parent, providing a safe and secure environment, father's machinations would have had difficulty succeeding.

Mother will receive four (4) weeks in the summer months with both minor children, and to the extent it is logistically feasible, reunification therapy should continue, even if done by telephone or videoconferencing, and should certainly continue during the four (4) weeks mother has custody of the minor children. This court

enters the following order:

## ORDER

And now, this 14th day of August 2014, after trial held, custody of the parties' minor son, M.J.P., born June 25, 1997, and daughter, M.P., born January 23, 2001, (hereinafter "minor children"), shall be as follows:

1. Defendant, Paul Pietrusewicz (hereinafter "father"), shall have sole legal custody of the minor children. That being said, plaintiff, Teresa Pietrusewicz (hereinafter "mother"), shall be provided all information regarding legal custody issues, including, but not limited to, education, medical, and extracurricular activities.

2. Father shall have primary physical custody of the minor children.

3. Mother shall have physical custody of the minor children for four (4) consecutive weeks during the summer months. The weeks shall be determined by agreement of the parties, but upon failure thereof, shall be during the month of July.

4. Mother shall be entitled to visits with the minor children in the State of California upon giving at least two (2) weeks' notice to father of her intention to travel to California for the visits. At no time during these visits may mother remove the children from California.

5. Whenever father travels to Pennsylvania with the minor children, he shall give mother notice of the days he intends to be in Pennsylvania, and shall provide her

with partial custody block of time equal to at least one (1) hour for every day he is in Pennsylvania, unless otherwise agreed.

6. Mother and the minor children shall continue to engage in reunification therapy. The reunification therapist currently employed may continue to assist. Reunification therapy shall take place when the minor children are present in Pennsylvania. The therapy may also be permitted through the use of telephone or videoconferencing. The cost for the counseling shall be shared equally by the parties.

7. This order shall be considered a final order finally resolving the issues raised in the petition of defendant, Paul Pietrusewicz, to modify a child custody order entered by this court on November 21, 2012.

8. If either party is planning to relocate with the children and the relocation will significantly impair any other party's exercise of custodial rights, the relocating party is obligated to provide a detailed notice and counter-affidavit by certified mail, return receipt requested, to all individuals who have custody rights to the children at least sixty (60) days in advance of the proposed relocation in compliance with 23 Pa. C.S.A. Section 5337.

9. The attached appendix shall be made a part of the within order.

## APPENDIX TO CUSTODY ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on

all parties. Violation of any of these rules could become the subject of contempt proceedings before this court, or could be grounds for modification of this order. The word "child" is used below, but these rules apply to all the children in the order. If any of these general rules conflict with any specific provisions of the order, the order shall control.

1. In addition to the rights in the order, all parties shall also have the following rights with respect to the child:

A. The right to reasonable telephone contact with the child when they are in the other party's custody.

B. The right to be fully informed concerning the progress of the child in school and the child's medical status, including the right to obtain information directly from the child's school or medical practitioner.

C. The right to be informed in advance before any important decision is made concerning the child and the opportunity to participate in those decisions.

2. In the event of any serious illness of the child at any time, the party then having custody of the child shall immediately communicate with the other parties by telephone or by any other means, informing the other parties as to the nature of such illness. During such illness, each party shall have the right to visit the child as he or she desires consistent with the proper medical care of the child.

3. None of the parties shall alienate or permit an attempt

by anyone else to alienate the child from the other parties. While in the presence of the child, none of the parties shall make any remarks or do anything which is derogatory or uncomplimentary to the other parties and it shall be the duty of each party to uphold the other parties as ones the child should respect and love.

4. Both parties shall provide each other with the addresses and telephone numbers of where they will be staying anytime they take a trip with the child out of the jurisdiction of Berks County in excess of three (3) days.

5. The parties shall not conduct arguments or heated conversation in the presence of the child or when the child can overhear the argument.

6. The parties shall at all times consider the child's best interests, and act accordingly. It is in a child's best interest for the parties to understand that the child is trying desperately to cope with the fact of his or her parents' separation, and needs help in loving both parents and any other involved parties.

7. Neither party shall question the child as to the personal life of any other party except insofar as necessary to insure the personal safety of the child. By this we mean that the child will not be used as a spy on any other party. It is harmful to a child to be put in the role of spy.

8. The parties should remember that they cannot teach the child proper moral conduct if that party is indulging in improper conduct. Children are quick to recognize hypocrisy, and the party who maintains a double standard

will lose the respect of the child.

9. Weekend and evening custody shall be subject to the following general rules:

A. Arrangements should be worked out beforehand between the parties without forcing the child to make choices and run the risk of displeasure. However, the child shall be consulted as to their schedules when appropriate.

B. Custodial rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other parties and to the needs and desires of the child.

C. If a party finds himself or herself unable to pick up or drop off the child at the designated or agreed to time, he or she should give immediate notice to the other parties to avoid subjecting the child to unnecessary worry or failed expectations.

D. The party having custody of the child should prepare them both physically and mentally for the transfer of custody to another party and should have them available at the time and place designated in the order or mutually agreed upon.

E. If any party or the child has plans which conflict with their scheduled custodial time and they wish to change their custodial time, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined

schedules are not written in stone, and the parties should be flexible for the sake of the child.

F. If a party shows up to begin their custodial time with the child and the party is under the influence of alcohol or drugs, the custodial time may be considered forfeited on those grounds alone.

10. If any party feels that another party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.